No. 93,694

STATE OF KANSAS, *Appellee*, v. ROSA E. SANCHEZ, *Appellant*.

144 P.3d 718

Opinion filed October 27, 2006.

*Christopher S. O'Hara*, of O'Hara, O'Hara & Tousley, of Wichita, argued the cause, and *Charles A. O'Hara*, of the same firm, was on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: Rosa Sanchez appeals her convictions and sentences for first-degree felony murder and aggravated battery of her 3-year-old son, arguing (1) she was denied a fair trial because an officer testified that she had invoked her right not to be interviewed; (2) she was denied a fair trial because she was prevented from presenting evidence; (3) the State erroneously charged her with felony murder based on aggravated battery as the underlying felony; (4) the district court improperly sentenced her for both felony murder and aggravated battery; and (5) she was denied a fair trial by cumulative error. We reject Sanchez' arguments and affirm her convictions and sentences.

## FACTS

During the afternoon of January 8, 2004, Sanchez was home with her children, 4-year-old Brandon, 3-year-old Brian, and 1-year-old Giovanni. Sanchez was also caring for her cousin's 3-year-old daughter, Marla, and 1-year-old son, Antonio. Sanchez' husband left for work at 3 p.m.

Sanchez' 16-year-old son Jose returned home from school at approximately 3:40 p.m. and began playing Nintendo in the living

room with his brother Brandon. Brian, Giovanni, Marla, and Antonio were playing in a back room connected to the bedroom.

At 4 p.m., Sanchez left to walk her 8-year-old daughter Jennifer home from school. When Sanchez returned at 4:30 p.m., Jose and Brandon were still playing Nintendo on the couch, and the younger children were playing in the back room. Sanchez sat on the couch and watched Jose and Brandon play Nintendo, while Jennifer went into the back room with the younger children.

After Brandon told Sanchez that Brian took two juices belonging to the other children, Sanchez became angry with Brian and called him to come into the living room. When Brian walked into the living room, he appeared normal. Sanchez began yelling at Brian about drinking the juice. Sanchez then went to the kitchen for a drink of water, and Brian went into the bedroom near the playroom. Sanchez followed Brian into the bedroom and pushed the door nearly closed.

Jennifer came out of the bedroom a few minutes later. When Jennifer opened the bedroom door, Jose saw his mother shaking Brian. Jose heard his mother yelling at Brian, and Brandon could hear Brian crying. A few minutes later, Sanchez left the bedroom and went to the kitchen for a glass of water and then returned to the bedroom.

Sanchez then exited the bedroom carrying Brian wrapped in a blanket and took Brian outside. When Sanchez took Brian outside, she was scared and crying. Sanchez called to Jose to bring her a glass of water. When Jose saw Brian, Brian's eyes were closed and he was having trouble breathing. Sanchez then told Jose to call her cousin Juana to pick them up.

Juana arrived a few minutes later and saw Sanchez outside, holding Brian and crying. As Juana was driving them to the doctor's office, Sanchez told Juana that Brian's stomach hurt because he drank juice.

Sanchez reached the doctor's office within 5 minutes. The doctor immediately noticed the bruises all over Brian's body and his extremely distended stomach. Brian was limp and unresponsive, with dilated pupils. When the doctor found no pulse and no blood pressure, he concluded that Brian was already dead. Nevertheless, the

doctor called an ambulance to transport Brian to the hospital because he believed there was a possibility of reviving Brian.

Brian was pronounced dead at the hospital at 6:20 p.m. An autopsy revealed that Brian had suffered substantial injuries from blunt force trauma. He had over 170 abrasions and contusions all over his body, including multiple areas of hemorrhaging in his scalp. Brian's mesentery, which contained the blood vessels that fed his small intestine, was completely torn away from his spine, and his small intestine was almost completely severed. Brian's stomach was torn and shredded, with two of the tears going all the way through the wall of his stomach, spilling the contents of his stomach into his abdomen. Brian's pancreas was torn into three pieces with one of the pieces floating inside his abdomen.

Police interviewed Sanchez less than 2 hours after Brian was pronounced dead. To explain Brian's death, Sanchez told police that Brian had fainted at Christmas, fallen off a slide a few days earlier, fallen off his bike 2 weeks earlier, fallen down dancing the night before, run into his younger brother and hit a wall earlier that day, fallen off the bed, and fought with the other children. After police questioned Jose and learned that Sanchez was angry with Brian about drinking the juice, Sanchez told police that she sat Brian on a dresser while she left to get a glass of water and found him lying face down on the floor when she returned. Sanchez also told the police that Brian's stomach was puffy the night before he died.

Sanchez was arrested on January 9, 2003, and charged with felony murder based on the underlying felony of aggravated battery or, in the alternative, child abuse. The State also charged Sanchez with one count of aggravated battery and, in the alternative, one count of child abuse. A jury found Sanchez guilty of felony murder, aggravated battery, and child abuse. At sentencing, the State elected aggravated battery as the underlying felony for Sanchez' felony-murder conviction and requested that Sanchez be sentenced consecutively for both counts. The district court sentenced Sanchez to life in prison for felony murder. For the aggravated battery, the district court sentenced Sanchez to serve 43 months

and ordered the sentences to run consecutively. Sanchez brings this appeal pursuant to K.S.A. 22-3601(b)(1).

ANALYSIS

ISSUE 1. *Was Sanchez Denied a Fair Trial Because an Officer Testified That Sanchez Invoked Her Right Not to Be Interviewed?*

Sanchez argues that she was denied her right to a fair trial because a detective with the Wichita Police Department testified that she "invoked her right not to be interviewed." Without any supporting argument, Sanchez claims that this comment violates *Doyle v. Ohio*, 426 U.S. 610, 617, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), which held that the government cannot impeach a defendant using his or her postarrest silence.

The comment at issue occurred during the following direct examination of Detective Jose Salcido by Sanchez' trial counsel:

"Q. And you told us that you had interviewed Rosa Sanchez?
"A. That is correct.
"Q. What date did that interview take place?
"A. The 8th, and then we tried to again interview her on the 12th, but then she invoked her right not to be interviewed."

Sanchez did not object to Detective Salcido's response. As a result, this issue is not properly before the court. An appellate court does not review an alleged *Doyle* violation when the defendant fails to raise a timely objection with the trial court. *State v. Brinkley*, 256 Kan. 808, 820-21, 888 P.2d 819 (1995); *State v. Fisher*, 222 Kan. 76, 83-84, 563 P.2d 1012 (1977).

Nevertheless, Sanchez' claim is without merit. *Doyle* is factually distinguishable from this case. In *Doyle*, the defendants were prosecuted for selling 10 pounds of marijuana to an informant. At trial, both defendants testified that the informant was selling the marijuana to them. On cross-examination, the prosecutor attempted to impeach the defendants' stories by asking why they had not told the police their version of the events when they were arrested. The State argued that it was necessary to inquire about the defendants' failure to tell their exculpatory story to police when they were arrested because the evidence would give rise to an inference that

the exculpatory story had been fabricated sometime between the defendants' arrests and their trials. The *Doyle* Court rejected the State's argument, holding that "the use for impeachment purposes of [a criminal defendant's] silence at the time of arrest and after receiving *Miranda* warnings" violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. 426 U.S. at 619.

Unlike the facts in *Doyle*, the testimony in this case was not in response to questioning by the State. The State did not cross-examine Detective Salcido about the statement or discuss the statement in closing argument.

In addition, the State was not attempting to impeach Sanchez' trial testimony by inferring that her exculpatory story was fabricated after her arrest. Sanchez did not testify. Her explanations for Brian's injuries were admitted through Detective Salcido's testimony during cross-examination by the State. Sanchez spoke with Detective Salcido before she was arrested, providing many exculpatory explanations of how Brian could have been injured. During a second interview with Detective Salcido before she was arrested, Sanchez stated that she remembered setting Brian on top of a dresser while she left the room to get a glass of water and returning to find him face down on the floor. Sanchez provided police with all of her exculpatory explanations before she was arrested. Thus, unlike *Doyle*, there was no need for the State to infer that she had fabricated her exculpatory story after her arrest.

As this court has previously stated:

"[A] *Doyle* violation occurs when the State attempts to impeach a defendant's credibility at trial by arguing or by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when confronted by police officers but instead invoked his or her constitutional right to remain silent." *Brinkley*, 256 Kan. at 820.

In *Brinkley*, the alleged *Doyle* violation occurred during direct examination when defense counsel inquired about the defendant's silence during an interview with police. During closing argument, Brinkley's defense counsel attempted to bolster Brinkley's credibility by highlighting his silence during the interview. The State did not reference the testimony or address it in closing argument.

The *Brinkley* court concluded that *Doyle* was inapplicable. 256 Kan. at 821.

Likewise, *Doyle* does not apply in this case. Sanchez' trial counsel elicited the testimony. The State did not cross-examine Detective Salcido about the statement or use the testimony in closing argument. Furthermore, the State did not need nor did it use Sanchez' silence to support the theory that she had fabricated her story after her arrest. Consequently, Sanchez was not denied a fair trial because of Detective Salcido's comment that she invoked her right not to be interviewed.

ISSUE II. *Did the District Court Prevent Sanchez From Presenting Evidence in Her Defense?*

Sanchez argues that the district court prevented her from admitting evidence in support of two of her defense theories. Sanchez' first theory was that the other children would have been emotionally upset if Sanchez had beaten Brian to death. Sanchez' second theory was that Jose had beaten Brian.

When considering challenges to the district court's admission or exclusion of evidence, an appellate court first must determine whether the evidence is relevant. After relevance is established, the court must apply the evidentiary rules governing the admission or exclusion of evidence either as a matter of law or in the exercise of the district court's discretion depending on the contours of the rule in question. *State v. Adams*, 280 Kan. 494, 504, 124 P.3d 19 (2005).

## A. *Emotional State of the Other Children.*

Sanchez wanted to admit evidence that Brian's siblings were not emotionally distraught when they were admitted to the Wichita Children's Home early in the morning the day after Brian died. Sanchez' theory was that the children would have been distraught if they had just witnessed their mother beating a sibling to death. According to Sanchez, the jury could infer that Sanchez had not beaten Brian because the children were not distraught.

When the State objected to the evidence, the district court asked Sanchez' trial counsel if she had scheduled an expert to testify

regarding the typical behavior of children after experiencing such an event. Defense counsel responded negatively, and the district court excluded the evidence as irrelevant, concluding that there was no factual basis for the inference.

In resolving this issue, it is important to note that there was no testimony that any of the children actually observed Sanchez beating Brian or knew what happened to Brian at the time they were admitted to the Wichita Children's Home. While questioning 5-year-old Brandon at trial, the prosecutor referred to the incident as the day "Brian got sick." Brandon testified that his mom went into the bedroom with Brian but closed the door, so he could not see what happened in the room. Although Brandon testified that he heard Brian crying, he also testified that he did not hear anything that made him upset. Likewise, Jose testified that he could not see what was happening in the bedroom. Jose testified that Jennifer was in the bedroom with Brian and Sanchez for a few minutes but left and went to the kitchen several minutes before Sanchez came out of the bedroom carrying Brian wrapped up in a blanket. Jose did not learn that Brian had died until several days after Jose was taken to the Wichita Children's Home.

The district court concluded that Sanchez' evidence was not relevant. Relevant evidence is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). The material fact Sanchez sought to prove was that she did not beat her son. However, the children's behavior when they were admitted to the Wichita Children's Home does not address whether she beat Brian. There was no evidence establishing that the children knew what happened to Brian or indicating what their reaction would be if they had witnessed the beating. Because the evidence of the children's behavior does not prove or disprove any material fact, it is not relevant. Thus, the district court properly excluded the evidence of the children's behavior when they were admitted to the Wichita Children's Home.

## B. Jose as the Perpetrator.

Sanchez also sought to infer that Jose killed Brian by admitting evidence that Jose had inappropriately touched Jennifer and hit

Brian. Sanchez' theory was that Jose changed his story to implicate her after Detective Salcido questioned him about inappropriately touching Jennifer.

At trial, Sanchez' counsel asked Jose if police had questioned him about touching Jennifer inappropriately. The State objected and requested a bench conference. Afterwards, Sanchez' trial counsel did not pursue that line of questioning with Jose.

The first test for the admission of evidence is relevance. *Adams*, 280 Kan. at 504. Jose's conduct toward Jennifer does not prove any material fact regarding his conduct toward Brian or what happened to Brian. Thus, the evidence is irrelevant and inadmissible. See K.S.A. 60-401(b); K.S.A. 60-407(f). The district court properly excluded the evidence regarding the allegation that Jose inappropriately touched Jennifer.

Nevertheless, Sanchez succeeded in presenting this negative innuendo to the jury. While Sanchez' trial counsel was examining Detective Salcido regarding his interview with Jose, Detective Salcido stated, "The sister was afraid, made a statement that she was afraid, [*i.e.,*] Jennifer. That's really why we were talking to him. We wanted to find out if it was, you know . . . ." Later in his testimony he stated, "[W]e wanted to know if there was something going on between him and the sister."

Regarding the evidence that Jose hit Brian on previous occasions and changed his story to implicate his mother only after being confronted about inappropriately touching Jennifer, the State argues that this evidence was admitted and argued by Sanchez' trial counsel. The record supports the State's argument. Detective Salcido testified that Jose admitted hitting his brothers when he was playing with them but consistently denied hitting Brian on the day Brian died. Detective Salcido further testified that Jose did not tell police that his mother hit Brian until after being confronted with information that Jose hit his brothers and scared his sister.

During closing argument, Sanchez' attorney used this evidence to imply that Jose killed Brian, stating:

"[Detective Salcido's] experience told him, his instinct told him he needed to talk to Jose, Jr., again. Detective Salcido knew that. After talking to Jose, Jr., the

first time, he knew that Brian was fine when Rosa left, and he knew that Brian wasn't fine when Rosa returned.

"He knew Jose, Jr.'s story had changed over and over again. He knew that Jose didn't want to be here. He didn't want to be in Kansas. He knew that Jose's brothers and sisters were afraid of him. So on January 12, three days after the decision had already been made to charge Rosa Sanchez with the death of her son, three days later, Detective Salcido knows what he has to do. He has to go and talk to Jose, Jr., again. He has to. This is not settled right with him. He knows there is something wrong with this case."

Sanchez cannot claim that the district court erroneously excluded evidence implicating Jose because the evidence was admitted and argued before the jury. On the other hand, the evidence of the children's behavior when they were taken to the Wichita Children's Home was irrelevant and properly excluded. Accordingly, this claim of error is without merit. The district court did not erroneously prevent Sanchez from presenting evidence in her defense.

ISSUE III. *Did the State Erroneously Charge Sanchez with Felony Murder Based on Aggravated Battery as the Underlying Felony?*

Sanchez claims that she should receive a new trial because the State could not convict her of felony murder based on the underlying felony of aggravated battery. Sanchez argues that the aggravated battery merged with the homicide.

Felony murder occurs when the killing of a human being is committed during "the commission of, attempt to commit, or flight from an inherently dangerous felony." K.S.A. 21-3401(b). Pursuant to K.S.A. 2005 Supp. 21-3436(b)(6), aggravated battery is deemed an inherently dangerous felony for the purposes of felony murder *only* when the aggravated battery is so distinct from the homicide as to not be an ingredient of the homicide. To determine whether the State properly charged Sanchez with felony murder based on aggravated battery as the underlying felony, the court must interpret K.S.A. 2005 Supp. 21-3436(b)(6). The interpretation of a statute is a question of law subject to de novo review. *State v. Rupnick*, 280 Kan. 720, 733, 125 P.3d 541 (2005).

In *State v. Lucas*, 243 Kan. 462, 759 P.2d 90 (1988), *aff'd on rehearing* 244 Kan. 193, 767 P.2d 1308 (1989), *superseded by statute State v. Colwell*, 246 Kan. 382, 385, 790 P.2d 430 (1990), this court considered whether the felony abuse of a child merged with the homicide requiring the dismissal of the defendant's conviction for felony murder. The deceased child in *Lucas* suffered from numerous injuries including patterned burns on her buttocks, cigarette burns on other parts of her body, severe fresh lacerations to her nipples, and many bruises all over her body. The cause of death was drowning after the child became unconscious from head injuries while in the bathtub. Noting that the elements of the underlying felony must be "so distinct from the homicide as to not be an ingredient of the homicide," the *Lucas* court concluded that the abuse merged with the homicide, precluding the application of the felony-murder rule. 244 Kan. at 473. The *Lucas* court stated:

> "Had an adult been beaten on the head, lost consciousness as a result thereof, and drowned in a pool of water or been asphyxiated by his blood or vomit, we would have no hesitancy in holding that the aggravated battery (the beating) was an integral part of the homicide and that it merged therewith and could not serve as the underlying felony. Can a different result logically be reached by designating the beating as abuse of a child rather than aggravated battery? We believe not." 243 Kan. at 470.

In *State v. Prouse*, 244 Kan. 292, 767 P.2d 1308 (1989), this court relied on *Lucas* and reversed the defendant's conviction for felony murder based on child abuse, concluding that the child abuse merged with the homicide. The *Prouse* court noted:

> "The collateral felony must, therefore, be felonious conduct other than the lethal act itself. Thus, a homicide occurring during the commission of an independent felony, such as aggravated robbery, rape, or kidnapping, comes under the felony-murder statute (K.S.A. 21-3401). However, the lethal act itself cannot serve as the independent collateral felony necessary to support a felony-murder conviction. Thus, an aggravated battery (K.S.A. 21-3414) resulting in the death of the victim merges into the homicide and cannot serve as the collateral felony for felony-murder purposes." 244 Kan. at 296-97.

The *Lucas* court suggested that the legislature consider enacting legislation to make the death of a child occurring during the commission of child abuse or aggravated battery against a child felony

murder if it wanted to provide additional protection for children. 243 Kan. at 473. After the *Prouse* decision, the legislature responded to the *Lucas* court's recommendation and amended K.S.A. 21-3401 to include "the killing of a human being committed in the perpetration of abuse of a child" as first-degree felony murder. L. 1989, ch. 87, sec. 1. However, the legislature did not amend the statute to include the killing of a human being committed in the perpetration of an aggravated battery as felony murder, indicating that it was not changing the *Lucas* or *Prouse* courts' analysis regarding aggravated battery.

In 1992, the legislature amended the definition of first-degree murder again, defining felony murder as "the killing of a human being committed in the commission of, attempt to commit or flight from *an inherently dangerous felony as defined in section 77 [K.S.A. 21-3436] and amendments thereto.*" (Emphasis added.) L. 1992, ch. 298, sec. 3; see K.S.A. 21-3401(b). At the same time, the legislature enacted K.S.A. 21-3436, defining inherently dangerous felonies, the original list of inherently dangerous felonies did not include aggravated battery. L. 1992, ch. 298, sec. 77. The legislature did not add aggravated battery to the list of inherently dangerous felonies until 1994, when it limited the application of the felony-murder rule for certain felonies, including aggravated battery, by requiring those felonies to be so distinct from the homicide as not to be an ingredient of the homicide. L. 1994, ch. 341, sec. 14.

In this case, the State argues that the offenses do not merge because Brian suffered 170 external injuries and 10 different internal injuries. Essentially, the State's theory is that multiple injuries must have resulted from multiple acts. However, the evidence in this case does not reveal what act or acts caused Brian's injuries or his death. Thus, the evidence in this case is insufficient to establish the State's theory that Brian suffered multiple aggravated batteries, only one of which caused his death.

Besides lacking evidence that Brian was subjected to multiple aggravated batteries, the State fails to address the factual similarity between this case and the *Lucas* case. Like Brian, the child victim in the *Lucas* case suffered from multiple bruises and injuries all

over her body. However, the *Lucas* court concluded that the child suffered from one incident of child abuse, which it equated to one incident of aggravated battery. 243 Kan. at 473. The *Lucas* court referred to the beating that killed the child as "a single instance of assaultive conduct" without considering the different types of harm the child suffered. 243 Kan. at 473. The same analysis applies in this case, especially given the lack of evidence regarding what actually caused Brian's injuries.

Because the aggravated battery inflicted upon Brian was not so distinct as to not be an ingredient in his homicide, the aggravated battery cannot serve as an inherently dangerous felony for the application of the felony-murder rule. See K.S.A. 2005 Supp. 21-3436(b)(6).

Sanchez argues that she should receive a new trial. However, a new trial is unnecessary. In the complaint, Sanchez was charged in count one with unlawfully killing her son "while in the commission of or the attempt to commit an inherently dangerous felony, to wit: Abuse of A Child, as defined in K.S.A. 21-3609 or Aggravated Battery, as defined in K.S.A. 21-3414." When the jury was instructed on count one it was instructed that it must find that the killing was done while in the commission of or an attempt to commit aggravated battery *or* abuse of a child. The jury was further instructed on the elements of both child abuse and aggravated battery. In completing the verdict forms, the jury unanimously found Sanchez guilty of abuse of a child and guilty of aggravated battery. In *State v. Davis*, 247 Kan. 566, Syl. ¶ 4, 802 P.2d 541 (1990), we determined that even if a conviction on one underlying felony must be reversed, the felony-murder conviction can still be valid when, on a separate verdict form, the jury unanimously finds the defendant guilty of a different, legally sufficient felony that supports the felony-murder conviction. In *Davis*, the defendant's felony-murder conviction was affirmed even though an aggravated robbery conviction was found legally insufficient because the jury had found the defendant guilty of aggravated arson, a legally sufficient felony to support the felony-murder conviction. Here, even though the aggravated battery conviction merged, the child abuse conviction did not because the legislature has determined that child abuse is

an appropriate underlying felony for felony murder regardless of whether the act of child abuse is so distinct from the homicide as to not be an ingredient of the homicide. See K.S.A. 2005 Supp. 21-3436(a)(7).

ISSUE IV. *Did the District Court Improperly Sentence Sanchez for Both Felony Murder and Aggravated Battery?*

Without analysis, Sanchez claims that the district court improperly sentenced her for both felony murder and aggravated battery. Sanchez was charged with three counts, one count of felony murder, one count of aggravated battery, and, in the alternative, one count of child abuse. Although not stated in Sanchez' brief, the issue regarding Sanchez' sentence is whether her sentence violates her right against double jeopardy.

The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights prohibit multiple punishments for a single offense. When a defendant is charged with multiple counts for a single offense, the charges are multiplicitous. The determination of whether counts are multiplicitous is a question of law. *State v. Schoonover,* 281 Kan. 453, 462, 133 P.3d 48 (2006).

In *Schoonover,* we announced an analytical framework which applies when the issues arise from cumulative punishments imposed in one case. We held that

"[i]n considering a double jeopardy issue, the overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and [if so] (2) By statutory definition are there two offenses or only one?" 281 Kan. at 496.

We elaborated on the first component:

"If the conduct is discrete, *i.e.,* committed separately and severally, the convictions do not arise from the same offense and there is no double jeopardy violation. If the charges arise from the same act or transaction, the conduct is unitary and the second component must be analyzed to see if the convictions arise from the same offense." 281 Kan. at 496.

There, we listed several factors to be considered in determining if conduct is unitary, *i.e.,* if it is the same conduct. They include

(1) whether the acts occurred at or near the same time; (2) whether the acts occurred at the same location; (3) whether there was a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there was a fresh impulse motivating some of the conduct. 281 Kan. at 497.

Here, Sanchez repeatedly beat her son at or near the same time, in the bedroom, without an intervening event, and with no evidence of a fresh impulse motivating the conduct. We conclude this constituted one transaction, *i.e.*, the convictions arose from the same conduct, and proceed to step two of the analysis.

The second component requires us to determine whether, by statutory definition, there are multiple offenses or only one. Because the double jeopardy issue in the instant case arises from convictions for multiple violations of different statutes, *i.e.*, felony murder and aggravated battery,

"the test to determine whether the convictions violate § 10 of the Kansas Constitution Bill of Rights is the same-elements test: whether each offense requires proof of an element not necessary to prove the other offense. If so, the charges stemming from a single act are not multiplicitous and do not constitute a double jeopardy violation." *Schoonover*, 281 Kan. 453, Syl. ¶ 12.

Felony murder requires the State to prove:
1. That the defendant killed another person;
2. That the killing occurred while in the commission of, attempt to commit or flight from an inherently dangerous felony;
3. The elements of the inherently dangerous felony.

See K.S.A. 21-3401(b); PIK Crim. 3d 56.02.

The inherently dangerous felony underlying the felony murder in this case is child abuse. The elements of child abuse are:
1. That the defendant intentionally tortured, cruelly beat, inflicted cruel and inhumane bodily punishment upon, or shook a child resulting in great bodily harm;
2. That the child was under the age of 18.

See K.S.A. 21-3609; PIK Crim. 3d 58.11.

To prove that Sanchez committed aggravated battery as charged in this case, the State was required to prove:

1. That the defendant intentionally caused great bodily harm to or disfigurement of another person.

See K.S.A. 21-3414(a)(1)(a); PIK Crim. 3d 56.18.

The *Lucas* court noted that abuse of a child is the same as aggravated battery against an adult. 243 Kan. at 470. However, under the same elements test, the crime of child abuse requires proof that the victim was under 18, which is not an element required in proving aggravated battery. Thus, the elements of child abuse and aggravated battery are different and the two crimes are not multiplicitous.

Although the State made a different election at sentencing, Sanchez' conviction for felony murder may be based on the underlying crime of child abuse because the jury also found Sanchez guilty of child abuse. Because aggravated battery and child abuse are not multiplicitous, Sanchez' sentences for aggravated battery and felony murder based on child abuse are not multiplicitous and do not violate her right against double jeopardy. Accordingly, the district court did not err by sentencing Sanchez for aggravated battery in addition to felony murder.

ISSUE V. *Was Sanchez Denied a Fair Trial by Cumulative Error?*

Finally, Sanchez argues that she was denied a fair trial due to cumulative errors by the district court.

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. [Citations omitted.]" *State v. Baker,* 281 Kan. 997, 1017, 135 P.3d 1098 (2006).

Sanchez has failed to demonstrate any trial errors that prejudiced her right to a fair trial. Accordingly, this issue is without merit.

Affirmed.