No. 70,823

STATE OF KANSAS, *Appellee,* v. FRANKLIN EUGENE SUTTON, *Appellant.*
(889 P.2d 755)

Opinion filed January 27, 1995.

*Jeffrey L. Shaw,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the briefs for appellant.

*Rex L. Lane,* assistant county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Franklin Eugene Sutton was convicted by a jury of one count each of felony murder, aggravated kidnapping,

and aggravated robbery. He was sentenced to consecutive terms of life, life, and 30 years to life. He appeals from the judgment of conviction and imposition of sentence.

Sutton testified that he and Brad Johnson went to Sasnak's on Thursday, March 4, 1993, at about 10:45 p.m. to play pool and drink beer. They had been driven to North Topeka and let out near Sasnak's by an acquaintance. Near midnight, Johnson arranged a ride for him and Sutton with Ben Creek. At Sutton's request, Creek drove to a grocery store several blocks from Sasnak's where Sutton bought cigarettes. When Sutton came out of the store, Johnson handed him an ATM card, told him a PIN number, and told him to get $50 and then $40 more if the account was not depleted. Sutton withdrew $50, then $40, and then the machine indicated that the funds were insufficient for another withdrawal. Sutton testified that he gave the card and the money to Johnson.

According to Sutton, he passed out after that and woke up "out in no-man's land." He woke up when Creek and Johnson were getting out of Creek's truck. He fell asleep again and when he woke up, Johnson was in the truck. Johnson said Creek was all right, but Sutton got out of the truck to check on him. Sutton heard a moan and found Creek lying face down with his hands tied behind his back. Sutton untied Creek's left wrist, rolled him over, and saw that his throat was cut. Sutton testified that he wanted to get help for Creek, Johnson did not, the two fought, and Johnson overpowered him.

Johnson and Sutton drove back to Topeka in Creek's truck. They went to 1006 S.E. Eighth Street. According to John McGill, he and Dan Deenihan and Susie Kidd lived there, Johnson was staying there, and Sutton was an occasional visitor. Johnson and Sutton arrived at the residence in a pickup truck in the early morning hours of Friday, March 5. Johnson brought a shotgun into the house, and Johnson and Sutton asked if McGill and Deenihan knew someone who would want to buy it. Johnson borrowed McGill's lighter to burn up a plastic card. Then Johnson and Sutton left in the pickup with the shotgun. Sutton testified that Johnson sold the shotgun at "a house on the east side." In

approximately an hour they returned to 1006 S.E. Eighth Street, backed the truck up to the house, and carried in tools. According to McGill, they no longer had the shotgun, but they had crack cocaine. Sutton, Johnson, Deenihan, and McGill used some of the crack cocaine that night. Creek's nephew testified that the usual contents of his uncle's pickup truck included a shotgun and tools.

On Friday morning, Ben Creek's body was found about 30 feet from a rural road in southwestern Jefferson County. There was a piece of string tied around his right wrist, his neck had been cut almost from ear to ear, and deep wounds could be seen on his inner thighs. An autopsy showed that there were three stab wounds on his thighs and that one which cut the femoral artery and vein was the most significant factor contributing to Creek's death. Bleeding from the cut on the front of Creek's neck also contributed to his death. There were a number of significant bruises as well as abrasions and lacerations on his head.

A resident of an apartment complex in Topeka testified that he saw two men, one white and one black, leave a pickup truck in the lot and walk away "just acting like they didn't have a worry in the world and enjoying one another." Sutton is black. In his brief, Sutton asserts that Johnson is white. Police located the pickup on Saturday and identified it as belonging to Ben Creek.

An acquaintance of Johnson and Sutton, who sometimes gave them rides in exchange for cigarettes and money, testified that on Sunday he and Johnson took some tools from the house on Eighth Street and sold them to a man on Western Street. When law enforcement officers searched the house on Eighth Street on Sunday evening, the tools were not there. A piece of burnt plastic which looked like a credit card was retrieved from the trash during the search.

We first consider Sutton's claim that the convictions and imposition of consecutive sentences for felony murder and the underlying felonies of aggravated kidnapping and aggravated robbery constitute double jeopardy. Citing *Whalen v. United States*, 445 U. S. 684, 688, 63 L. Ed. 2d 715, 100 S. Ct. 1432 (1980), Sutton contends that the sentences imposed on him were multiple pun-

ishments for the same offense, in violation of the double jeopardy protection of the Fifth Amendment to the United States Constitution. Sutton argues that *State v. Gonzales*, 245 Kan. 691, 783 P.2d 1239 (1989), and *State v. Dunn*, 243 Kan. 414, 758 P.2d 718 (1988), in which this question was answered adversely to his position, were wrongly decided.

Like Sutton, Lisa Dunn was convicted of felony murder, aggravated kidnapping, and aggravated robbery. Like Sutton, she argued that those convictions violated the double jeopardy clause. "She reason[ed] that the aggravated robbery and kidnapping charges are lesser included offenses of felony murder and that convictions for both murder and the underlying felonies constitute multiple punishment for the same offense." 243 Kan. at 432. The court disagreed:

"The constitutional prohibition against double jeopardy is directed to the identity of the offense and the act. Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied when determining whether there are two offenses or only a single offense is whether each statutory provision requires proof of an element that the other does not. Where one statute provides proof of an element that the other does not, the crimes are not the same, even though proof of the separate crimes may substantially overlap.

"K.S.A. 1987 Supp. 21-3107 provides:

'(1) When the same conduct of a defendant may establish the commission of more than one crime under the laws of this state, the defendant may be prosecuted for each of such crimes. Each of such crimes may be alleged as a separate count in a single complaint, information or indictment.

'(2) Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:

'(a) A lesser degree of the same crime;

'(b) an attempt to commit the crime charged;

'(c) an attempt to commit a lesser degree of the crime charged; or

'(d) a crime necessarily proved if the crime charged were proved.'

"Dunn's contention that the aggravated robbery charge merges into the homicide charge is unfounded. Murder in the first degree is the killing of a human being committed maliciously, willfully, deliberately, and with premeditation or *committed in the perpetration or attempt to perpetrate any felony*. K.S.A. 21-3401. The underlying felony of robbery is the taking of property from the person or presence of another by threat of bodily harm to his person or the person of another or by force, K.S.A. 21-3426, and becomes aggravated robbery where

the robbery is committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery. K.S.A. 21-3427.

". . . .

". . . If there is evidence to support the elements of kidnapping and evidence to support that a homicide was committed during the perpetration of the kidnapping, then the offenses would not merge. Both of the felony convictions here are convictions for crimes independent of the homicides; therefore, they do not merge.

"Dunn's convictions of aggravated robbery, aggravated kidnapping, and felony murder require the State to prove an element in each offense that is not required in the other offenses. Dunn's multiple convictions for the single act or transaction are constitutionally permissible." 243 Kan. at 432-33.

In *State v. Gonzales*, 245 Kan. 691, Timothy Gonzales was convicted of felony murder and attempted rape. He contended that his convictions for both offenses violated the double jeopardy clause. In this regard, the court stated:

"Gonzales contends that the *Dunn* opinion was wrong. He argues that, because proof of the underlying felony is an essential element of the crime of felony murder, any underlying felony is a lesser included offense of felony murder. He cites *Whalen v. United States*, 445 U.S. 684, 63 L. Ed. 2d 715, 100 S. Ct. 1432 (1980).

"In *Whalen*, the defendant was convicted in the District of Columbia of rape and felony murder, the rape being the underlying felony to support the felony-murder conviction. Whalen was given consecutive sentences for the two charges and he argued that the imposition of consecutive sentences was contrary to federal statutory and constitutional law. The Court held that the double jeopardy clause precludes federal courts from imposing consecutive sentences unless authorized by Congress. 445 U.S. at 689.

"The Court, therefore, had to interpret whether consecutive sentences were authorized by Congress under the District of Columbia Code in that particular fact situation. The Court cited the rule of *Blockburger v. United States*, 284 U.S. 299, 304, 76 L. Ed. 306, 52 S. Ct. 180 (1932):

'The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'

"At the time of the *Whalen* opinion, D.C. Code Ann. § 23-112 (1973) provided that sentences imposed were to run consecutively 'whether or not the offense . . . *arises out of the same transaction and requires proof of a fact which the other does not.*' The Court held that this statute was a codification of the *Blockburger* rule. The Court said, 'A conviction for killing in the course of a

rape cannot be had without proving all the elements of the offense of rape.' 445 U.S. at 693-94. Therefore, the Court held that the trial court erred in giving Whalen consecutive sentences.

"In *Missouri v. Hunter*, 459 U.S. 359, 74 L. Ed. 2d 535, 103 S. Ct. 673 (1983), the defendant was convicted under Missouri law of robbery in the first degree and armed criminal action. The charges arose out of the same incident: the robbery of a supermarket. The Court stated:

. . . .

'Our analysis and reasoning in *Whalen* and *Albernaz* lead inescapably to the conclusion that simply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes. The rule of statutory construction noted in *Whalen* is not a constitutional rule requiring courts to negate clearly expressed legislative intent.' 459 U.S. at 368.

"The resolution of this issue, therefore, depends on whether the Kansas Legislature intended to allow conviction and punishment for both felony murder and the underlying felony.

"The issue of legislative intent was not addressed in *Dunn*. A perusal of Kansas cases indicates that it is common practice for a defendant to be charged with felony murder and the underlying felony. See, *e.g.*, *State v. Dunn*, 243 Kan. 414; *State v. Longobardi*, 243 Kan. 404, 756 P.2d 1098 (1988). We have ruled that a defendant need not be charged and convicted of the underlying felony in order to be convicted of felony murder. *State v. Wise*, 237 Kan. 117, 122, 697 P.2d 1295 (1985).

"K.S.A. 21-3401 was enacted in 1969, when the legislature enacted the new Kansas Criminal Code. The statute made no substantive change in the law. *Proposed Kansas Criminal Code*, Kansas Jud. Council Bull., Comment, April 1968, at 46.

"A major amendment was made to the statute in the past year. L. 1989, ch. 87, § 1. This amendment was in response to this court's decision in *State v. Prouse*, 244 Kan. 292, 767 P.2d 1308 (1989). In *Prouse*, the defendant had been charged with felony murder, with child abuse as the underlying felony. The defendant had been convicted of both child abuse and felony murder. This court reversed the felony-murder conviction, finding that felony murder cannot be based on child abuse under the merger doctrine. . . .

"The legislature amended K.S.A. 21-3401 to specifically include child abuse as a collateral felony for felony murder. The legislature remained silent as to the issue of charging the defendant with both the underlying felony and felony murder; therefore, one can surmise that the legislature approved of this practice. The example given in *Prouse* reflects the absurdity of prohibiting such a practice. If such were the case in the example given, if the victim lived, the State could prosecute the defendant on two charges, but if the victim died, the State could only prosecute on one charge.

. . . .

"Defendant argues that [K.S.A. 21-3107], *State v. Fike*, 243 Kan. 365, 757 P.2d 724 (1988), and *State v. Adams*, 242 Kan. 20, 744 P.2d 833 (1987), preclude his conviction of both charges because the alleged elements of attempted rape must be proved in order to prove felony murder. He specifically relies upon subsection (2)(d) above quoted and the second prong of the *Fike* test, which is whether the specific factual allegations and evidence required to prove the crime charged also necessarily prove the lesser crime. 243 Kan. at 368.

"The flaw in defendant's argument is that he fails to recognize the distinction between the 'lesser included offense' doctrine and the 'felony-murder' doctrine. Each is a separate theory of law. Each exists in a distinct legal pigeonhole. *Adams* and *Fike* are not applicable to the instant case in that they deal with the concept of lesser included offenses.

"The appropriate test to apply to the instant case is found in *State v. Dunn*, 243 Kan. at 432-33 . . . ." 245 Kan. at 703-06.

*Dunn* and *Gonzales* are dispositive of this issue. Defendant's conviction and consecutive sentences for felony murder and the underlying felonies of aggravated kidnapping and aggravated robbery do not constitute double jeopardy.

Sutton next claims the evidence was insufficient to allow a rational factfinder to find him guilty of the crimes charged beyond a reasonable doubt. This court repeatedly has stated:

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Timley*, 255 Kan. 286, Syl. ¶ 13, 875 P.2d 242 (1994).

Sutton disregards the well-established standard of review and urges the court to review evidence which tends to exculpate him and to conclude that the evidence of guilt was insufficient because "[s]ignificant evidence presented at trial leads to the conclusion that [he] did not kill Ben Creek." Among the exculpating evidence he wants the court to consider are the following items:

—Johnson's hair was found on Creek's hands.
—Johnson routinely carried a knife.
—Johnson sold the tools.
—Johnson sold the shotgun.
—Johnson burned the plastic card.
—Johnson is physically larger than Sutton.

If we considered the evidence highlighted by Sutton, we would be acting contrary to the above rule that all the evidence in favor of the verdict is to be reviewed by the appellate court on a challenge to the sufficiency of the evidence.

Sutton compares his case with *State v. Williams*, 229 Kan. 290, 623 P.2d 1334 (1981), in which the defendant's convictions of aggravated burglary and felony murder were reversed. The cases are not comparable. Although he denied culpability, Sutton testified that he withdrew money at an automatic teller machine, that he was present at the rural spot where Creek's body was found, that he saw Creek lying on the ground, and that he accompanied Johnson to sell the shotgun. Another witness described seeing men matching Johnson's and Sutton's descriptions leaving Creek's pickup truck in an apartment parking lot.

*Williams* is like the present case only with regard to codefendants. There was substantial evidence linking Williams' codefendant to the rape and murder of a young woman in an apartment opposite the apartment where Williams and the codefendant lived. Police theorized from the condition of the victim's body that there might have been two assailants, but information which had been used by police in obtaining search warrants and which tended to implicate Williams as the second assailant was not developed at trial. The only evidence introduced against him was quite weak. It consisted of seminal fluid stains on the bedspread of a type present in 80% of 41% of the population and of undeterminable age; a cigarette package of a type smoked by several people with access to the car in which it was found; one pubic hair which showed characteristics of the hair of the victim's boyfriend found in underwear in the trunk of the car that several people, including the codefendant, had access to; some inconsistencies between Williams' first and second interviews with police; and the condition of the body, from which it was theorized that there were two assailants. 229 Kan. at 297-300.

We conclude that a rational factfinder could have found Sutton guilty of the crimes charged beyond a reasonable doubt.

Sutton next claims it was error for the district court to admit photographs of the victim's body. Over defendant's objection, the

district court admitted into evidence photographs (Exhibits 13, 15, 21, and 27) taken of Creek's body where it was found. Photographs taken during the autopsy (Exhibits 31-36, 38, 41, and 42) were admitted without objection. On appeal, Sutton argues that the photographs were useless, irrelevant, needlessly repetitious, shocking, and inflammatory.

The rule governing the admissibility of photographs like the ones at issue recently has been stated:

"The law is well settled in this state that, in a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome." *State v. Stone*, 253 Kan. 105, Syl. ¶ 3, 853 P.2d 662 (1993).

In the present case, the photographs taken where the body was found were introduced to corroborate the testimony of a law enforcement officer who described the appearance of the body, the clothing, and the surrounding ground. The photographs taken during the autopsy were used to corroborate and illustrate the testimony of the pathologist.

In *Stone*, the court stated:

"The admission of photographs as evidence in a homicide case rests within the trial court's discretion, and that court's ruling will not be disturbed on appeal absent a showing of abuse of discretion. *State v. Mayberry*, 248 Kan. 369, 383, 807 P.2d 86 (1991); *State v. Prouse*, 244 Kan. 292, 294, 767 P.2d 1308 (1989); *State v. Lucas*, 243 Kan. 462, 476-77, 759 P.2d 90 (1988). Photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. *State v. Boyd*, 216 Kan. 373, 377, 532 P.2d 1064 (1975). Nevertheless, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. *State v. Mayberry*, 248 Kan. at 383." 253 Kan. at 111.

Sutton argues with regard to photographs of the neck wound that the physical facts which they reproduced were not relevant because the pathologist testified that bleeding from the neck wound was not the primary cause of Creek's death. When asked whether the neck wound was the cause of Creek's death, the pathologist responded: "I feel that this injury was contributory.

I feel that Mr. Creek would have lost a great deal of blood from this wound but it would have been a very, very slow process if this was the only wound that he had received." The pathologist testified that she believed the stab wound in the left thigh which cut the femoral artery was the most significant contributing factor to the victim's death. When asked her opinion about the cause of death, the pathologist testified that Creek "died of blood loss . . . due to the multiple stab wounds to the body, which were exacerbated by the slash wound to the neck, and also the beating to the head." Any injury which contributed to the victim's death is relevant, and this court has never indicated that only photographs of the injury which constituted the primary cause of death properly may be admitted.

Sutton argues that Exhibit 34 is particularly gruesome and irrelevant. It is an undeniably gruesome depiction of a part of the autopsy process in which the scalp has been pulled back to reveal the skull. The pathologist testified that the photograph shows a large bruise which could not be seen with the scalp in place. As we have seen, the pathologist testified that the beating to Creek's head contributed to his death.

Sutton also questions Exhibit 42, which depicts the thigh wound where the femoral artery was cut. He suggests that this photograph should not have been admitted because he did not dispute the cause of death. He cites *State v. Boyd*, 216 Kan. 373, 532 P.2d 1064 (1975). In that case, the court reversed for failure to give a requested instruction and disapproved the admission of certain photographs:

"The state's medical expert made it clear that death was due to internal bleeding resulting from stab wounds. Some of the photographs which were admitted could have been helpful to the jury by showing the angle of penetration of the murder instrument into the deceased's body. We fail to see the necessity, however, of the state's offering repetitious exhibits to prove the same point. In our judgment the trial court abused its discretion in admitting into evidence repetitious photographs of the deceased's body taken at the autopsy and especially exhibit 39." 216 Kan. at 378.

Sutton also cites *State v. Willis*, 254 Kan. 119, 865 P.2d 1198 (1993), in which the court reversed on the issue of witness con-

frontation and made the following comment about a grisly photograph:

"We question the relevancy of Exhibit 11 based on the current record. Exhibit 11 is a photograph of the body after it had been moved. It shows a decomposed and decaying corpse displayed on a white sheet. Exhibit 11 does not depict the body as it was found. The ravages of time and the elements have reduced the body to its exhibited state. Upon retrial, relevancy as well as any other appropriate admissibility questions will be ruled on by the trial court as it exercises its discretion in determining admissibility. See *State v. Minski*, 252 Kan. 806, 817, 805 P.2d 809 (1993)." 254 Kan. at 132.

Sutton suggests that *Willis* signals the court's willingness to take action on the issue of gruesome photographs. He is unable to say, however, that the action will be to make the admission of such photographs a ground for reversal, without more.

The State contends that the subjects of the disapproved photographs in *Boyd* and *Willis* differ significantly from the subjects depicted in the present case. With the exception of Exhibit 34 in which the scalp was pulled away from the skull, the State has a point. Exhibit 34 may be differentiated from the photographs in *Boyd* and *Willis* in its depicting an injury which was involved in Creek's death and which could not be detected with the scalp in place. In other words, it was not devoid of relevance, and the particularly distasteful nature of the depiction served the purpose of illustrating an injury not otherwise apparent. In his reply brief, Sutton takes issue with the State's distinguishing Exhibit 27, to which Sutton objected, from the objectionable photograph in *Willis*, which depicted the victim's body after it had been moved and placed on a sheet. The State asserts that Exhibit 27 depicts the neck wound "as seen by law enforcement officers at the scene." Sutton argues that the body may have been at the scene, but it had been rolled over from the face-down position in which it was found and that the throat wound had been exposed by tilting the head back. A law enforcement officer testified that Creek's body was lying face down and ambulance personnel turned it over. It appears from a comparison of Exhibit 15 with Exhibit 27 that the position of the head in these two photographs differs slightly. Such a distinction does not render the photographs inadmissible

absent a showing that the photographs are not relevant or unduly gruesome or repetitious.

The photographs were admissible; in addition, defense counsel did not object to the autopsy photographs, which include Exhibits 34 and 42. The erroneous admission of evidence may not be raised on appeal absent a timely objection to the evidence, so stated as to make clear the specific ground of the objection. K.S.A. 60-404. We find no abuse of discretion in the admission of the photographs into evidence.

Sutton also claims it was error for the district court to give the instruction requested by defendant's counsel on voluntary intoxication rather than the current pattern instruction. Among the instructions which Sutton included in his written request to the district court is the following: "PIK 2d 54.12 as to the voluntary intoxication of the Defendant," citing *State v. McDaniel & Owens*, 228 Kan. 172, 612 P.2d 1231 (1980). While the PIK Crim. 2d volume was in use, the voluntary intoxication instruction underwent some change. Thus, it is not possible to tell solely from the defendant's request for "PIK 2d 54.12" which version of the instruction he wanted. Because *McDaniel & Owens* also was cited by defendant, though, it seems reasonable to infer that the version at issue in that case was the one being requested by him. The voluntary intoxication instruction in *McDaniel & Owens* actually is quoted from PIK Crim. rather than PIK Crim. 2d, but for a period of time after PIK Crim. 2d was issued, the same version of the instruction appeared in that volume. It stated:

" 'Voluntary intoxication is not a defense to a criminal charge, but when a particular intent or other state of mind is a necessary element of the offense charged, intoxication may be taken into consideration in determining whether the accused was capable of forming the necessary intent or state of mind.' " 228 Kan. at 178.

In the present case, the district court so instructed the jury.

On appeal, Sutton complains that the district court should have given PIK Crim. 3d 54.12, which states:

"Voluntary intoxication is not a defense to a charge of (set out general intent crime).

"(Voluntary intoxication, however, may be a defense where the evidence indicates that a defendant acted only as an aider or abettor, and may be considered

in determining whether such defendant was capable of forming the required intent to aid or abet the commission of [general intent crime charged].)"

He argues that there was evidence which would support a finding that he acted only as an aider or abettor. The district court instructed the jury on aiding and abetting as follows:

"A person who intentionally aids another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable."

"A person who, either before or during its commission, intentionally aids another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

These instructions seem to have been warranted by Sutton's account of his involvement. He testified that he thought the ATM card with which he withdrew money belonged to Johnson and that Johnson alone was responsible for Creek's death. The evidence also showed that it was Johnson who sold the shotgun and tools.

In *McDaniel & Owens*, the jury was instructed that voluntary intoxication is not a defense to aggravated robbery, the crime charged. McDaniel was convicted as a principal for that offense, which requires only general intent rather than specific intent. Owens argued, and this court agreed, that specific intent is at issue where the evidence indicates that the defendant could only be found guilty as an aider or abettor. The court stated: "When the evidence indicates a defendant could only be found guilty of aggravated robbery as an aider and abettor, specific intent is an issue, and voluntary intoxication may indicate an absence of the required intent and be a defense." 228 Kan. 172, Syl. ¶ 5. Owens' conviction was reversed because "the trial court erred by not instructing the jury in accordance with PIK Crim. 54.12." 228 Kan. at 179.

The obvious difference between *McDaniel & Owens* and the present case is that in the earlier case, the district court gave a nonpattern instruction on voluntary intoxication which flatly stated that voluntary intoxication is not a defense to aggravated robbery. Owens argued, and this court agreed, that the district court should

have given PIK Crim. 54.12. In the present case, the district court, at the request of Sutton's trial counsel, gave the instruction which was hailed as correct in *McDaniel & Owens*. On appeal, however, Sutton's appellate counsel argues that the most recent version of 54.12 should have been given instead.

In *State v. Patchett*, 229 Kan. 163, 621 P.2d 1011 (1981), the defendant argued the district court erred in instructing the jury on criminal trespass to property as a lesser included offense of burglary. We held the giving of the instruction was not reversible error because

"it was the defendant who requested the instruction on criminal trespass to property. When a defendant requests an instruction at the trial level and such instruction is given, the defendant cannot predicate error on the giving of the instruction which he requested. *State v. Sanders*, 223 Kan. 273, 280-81, 574 P.2d 559 (1977); *State v. Gross*, 221 Kan. 98, Syl. ¶ 1, 558 P.2d 665 (1976)." 229 Kan. at 165.

In *State v. Phillips*, 252 Kan. 937, 850 P.2d 877 (1993), this court said:

"There is another compelling reason why the issue lacks merit or further review. The instruction given, and now contended to be insufficient, is the identical instruction requested by the defendant at trial. 'A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal.' *State v. Prouse*, 244 Kan. 292, 298-99, 767 P.2d 1308 (1989); *State v. Salton*, 238 Kan. 835, Syl. ¶ 1, 715 P.2d 412 (1986). Even if we assume that *Bailey's* [*State v. Bailey*, 251 Kan. 156, 834 P.2d 342 (1992),] reliance on *Foster* [*v. State*, 779 P.2d 591 (Okla. Crim. 1989),] may merit reconsideration by this court, the issue is not properly before the court in this appeal. This issue of the defendant lacks merit." 252 Kan. at 947.

In the present case, since defendant requested that the instruction be given, he cannot now complain on appeal. We therefore find no merit in defendant's claim of error in the trial court's instruction on voluntary intoxication.

Sutton's final claim is that the district court should have granted a new trial based on the State's failure to disclose that money was found on the victim's body. The pathologist who performed the autopsy of Creek's body testified that when she removed his right sock, she found a $20 bill and a $10 bill. A photograph of the pathologist holding the bills was offered into evidence by the

State and objected to by Sutton's counsel on the ground that he had not seen or been told about it. The matter was taken under advisement by the district court but does not seem to have been resolved. In the record on appeal is an affidavit of the attorney who represented Brad Johnson when he was tried for the robbery, kidnapping, and murder of Creek. He states:

"4. That at no time prior to, during or after the trial did the State produce to me the evidence it attempted to admit at the trial of Franklin Eugene Sutton. More specifically, the evidence being that thirty dollars ($30.00) was discovered on the person of the victim, Ben Creek, at the autopsy.

"5. That the first time affiant was made aware of these facts was during a discussion with John Kurth, attorney for Frank Sutton after both trials had concluded."

One of the grounds relied upon by Sutton in his motion for new trial was the "misconduct" of the State in failing to advise him of the money's discovery "in violation of the Court's order on Defense's Motion For Discovery and Inspection and Defense's Motion For Early Production and in violation of *Brady v. Maryland*, 373 U.S. 83 (1976)." The argument he made to the district court and repeats on appeal is that Sutton may have been prejudiced by the State's failure because the money may have been obtained by Creek when the withdrawals were made from his account at the automatic teller machine. Defendant's counsel contended that if he had known of the money before trial, he could have checked with the bank to see whether the serial numbers on Creek's bills could be matched with those of the withdrawn bills. He theorizes that matching bills may have "negated the evidence of aggravated robbery." He does not attempt to explain why he did not check with the bank after seeing the photograph and hearing the testimony at trial on August 10 and before the hearing on the motion for new trial on September 14.

The State argues here, as it did in the district court, that all the photographs from the autopsy, including the photograph of the money found in Creek's sock, were made available during discovery for inspection by defense counsel. Sutton does not dispute the State's position, but he contends that he did not scrutinize all the photographs because cause of death was not in issue

and the money was not noted in the coroner's report. To this point the State responds that there is nothing which requires the coroner to include such things in her report and, moreover, that the State should not be held accountable for the completeness of the coroner's report.

The district court concluded that the State had not withheld the evidence of money found in Creek's sock and that no prejudice was suffered by Sutton as a result of his counsel's belated discovery of the evidence. We conclude that the district court's conclusion was correct.

The judgment of the district court is affirmed.